Eastern District of Kentucky
**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

JUN 06 2024

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

DR. MARKCUS KITCHENS, JR.

      PLAINTIFF

v.

NATIONAL BOARD OF MEDICAL EXAMINERS

**REGISTERED AGENT:**
  CT Corporation System
  1015 15th Street NW, Ste. 1000
  Washington, DC 20005

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES

**REGISTERED AGENT:**
  CT Corporation System
  1015 15th Street NW, Ste. 1000
  Washington, DC 20005

FEDERATION OF STATE MEDICAL BOARDS

**REGISTERED AGENT:**
  CT Corporation System
  1015 15th Street NW, Ste. 1000
  Washington, DC 20005

      DEFENDANTS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT

Comes the Plaintiff, Dr. Markcus Kitchens Jr., *pro se*, and for his Complaint against Defendants National Board of Medical Examiners ("NBME"), Educational Commission for Foreign Medical Graduates ("ECFMG"), and Federation of State Medical Boards ("FSMB"), and hereby states as follows:

## PRELUDE

For many years, the National Board of Medical Examiners, Educational Commission for Foreign Medical Graduates, and Federation of State Medical Boards have built the singular manner and method for aspiring medical professionals to become licensed providers. At the same time, they have oriented themselves in such a manner that they are virtually unstoppable: from their legal status[1], being the sole entities that determine what the prerequisite(s) are for certification[2], even down to how much is paid and/or how many attempts on the United States Medical Licensing Examination Program (hereinafter "USMLE") are permitted. Rather than mirror similar licensing entities such as the National Conference for Bar Examiners (NCBE), or adapt to ever changing technology(ies) and/or understanding in medicine, Defendants National Board of Medical Examiners (hereinafter "NBME"), Educational Commission for Foreign Medical Graduates (hereinafter "ECFMG"), and Federation of State Medical Boards (hereinafter "FSMB") would change its rules, requirements, and threshold for obtaining a passing grade that would allow each entity to charge higher fees, thwart potential candidates from obtaining licensure, and ensure the gatekeeping function of the pathway to licensure. Defendants NBME, ECFMG, and FSMB have deployed these tactics across the world in their services, products, and portals, including the administration of the USMLE Board Exams, the OASIS portal, and Certification by ECFMG, among others.

---

[1] The National Board of Medical Examiners and the Educational Commission for Foreign Medical Graduates are 501(c)(3) non-profit organizations; the Federation of State Medical Boards is a 501(c)(6) non-profit organization.

[2] *See* USMLE Policy Change Announcement, February 12, 2020. **Exhibit 1.**

Defendants NBME, ECFMG, and FSMB's collective conduct also stifles any ability by students, residents, and/or medical graduates from bringing about change, which could make it easier for individuals to become licensed professionals – or allow for individuals to ensure that their abilities are accurately assessed and portrayed for potential employers. Simply put, NBME, ECFMG, and FSMB's continued restrictions for licensure ensured that medical professionals are solely governed by the Defendants NBME, ECFMG, and FSMB while dictating who(m) qualifies for licensure.

Critically, NBME, ECFMG, and FSMB's anticompetitive conduct not only limits competition in the medical licensing industry, but also reverberates throughout the industries that are affected by these restrictions, including financial services, academic credentials, and third-party study programs. Unless the NBME, ECFMG, and FSMB's exclusionary and anticompetitive conduct is stopped, the Defendants' entrenchment will only become further ingrained into the medical community and other parts of the economy. For example, NBME only permits the USMLE Program to be administered through certified Prometric centers – doing so in exclusionary ways that further reinforce and deepen the anticompetitive manner around medical licensure.[3]

This case is about relieving aspiring medical practitioners from NBME, ECFMG, and FSMB's exclusionary conduct and restore individuals' ability to fully participate

---

[3] *See* Prometric Center USMLE Home Page, https://www.prometric.com/test-takers/search/usmle. **Exhibit 2**.

in the licensure process in a manner that is transparent and consistent with the actual practice of medicine.

## Table of Contents

I.   INTRODUCTION..................................................................................................... 6

   a.   Background                                                                          6

   b.   NBME Expands Into the Global Market                                                 7

   c.   Collaboration and Creation of the USMLE                                            13

   d.   Global Expansion of the NBME                                                       15

II.  The USMLE Program Is A Platform ................................................................ 17

III. NBME AND FSMB UNLAWFULLY MAINTAINS THEIR MONOPOLY POWER ................................................................................................................. 19

   a.   NBME Harms Competition By Imposing Contractual Restriction, Fees, And Taxes On Study Materials And Distribution                              19

IV.  THE NBME, FSMB, AND ECFMG USE ITS MONOPOLY POWER TO CONTROL THE BEHAVIOR OF APPLICANTS IN ORDER TO INSULATE THEMSELVES FROM COMPETITION .................................................................. 26

V.   THE NBME, FSMB, AND ECFMG'S 'MOAT' AROUND THE USMLE PROGRAM MONOPOLY IS WIDE AND DEEP .................................................... 30

VI.  ANTICOMPETITIVE EFFECTS ....................................................................... 31

   a.   The NBME, FSMB, and ECFMG's Conduct Harms the Competitive Process                                                                             31

   b.   NBME, FSMB, And ECFMG Have Every Incentive To Use Their Monopoly Playbook In The Future                                                  34

VI.  PRIVACY, INTEGRITY OF THE EXAMINATION, SECURITY, AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY THE NBME, FSMB, AND ECFMG'S ANTICOMPETITIVE CONDUCT ................... 36

VII.     SPECIFIC FACTUAL BACKGROUND ..................................................... 40

IX.  PARTIES ............................................................................................................ 41

X.   JURISDICTION, VENUE, AND CHOICE OF LAW ...................................... 42

XI.  CAUSES OF ACTION ....................................................................................... 44

   COUNT I   Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1 (NBME) 44

COUNT II        Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1
(ECFMG)         45

COUNT III       Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1
(FSMB)          47

COUNT IV        Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2
(NBME)          48

COUNT V         Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2
(ECFMG)         49

COUNT VI        Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2
(FSMB)          50

COUNT VII       Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13
(NBME)          52

COUNT VIII      Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13
(ECFMG)         53

COUNT IX        Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13
(FSMB)          54

XII.    REQUEST FOR RELIEF ........................................................................ 56

## I.    INTRODUCTION

### a. Background

1.      The National Board of Medical Examiners was founded in 1915 to elevate the standard of qualification for the practice of medicine-surgery and provide a means for recognition of qualified persons to practice in any state, territory, or dependency of the United States without further examination. From its inception, the NBME has administered an examination that 'elevated the standard' of what was considered qualified by imposing strict eligibility criteria. During its first administration of the [now] USMLE, thirty-two physicians applied to take the exam. Of the thirty-two applicants, sixteen physicians were eligible; only ten physicians elected to take the exam, and of the ten – only five physicians 'passed'.

2.      After changing the manner in which the examination was administered in 1922 to the end of 1923, nearly four hundred (400) physicians had passed the NBME's examination. Around this time, the physicians that passed the examination developed a membership 'emblem' in the form of a golden key. Physicians considered the examination as "a feather in his/[her] cap" for passing.

3.      The NBME converted the examination from solely essay question(s) to multiple-choice format and half in the traditional essay formation. Each of the questions were graded by an examiner within the NBME and NBME assigned a minimum passing grade for the multiple-choice portion and compared said grade with the essay portion. Statistical analysis of the examinations demonstrated the correlation between grades and long-term evaluation(s) of students in medical schools

and increased reliability-validity. The multiple-choice format gave the NBME the algorithm that it still uses to this day: a standardized exam that is created, developed, administered, and graded by the NBME. More importantly, it allows the NBME to exercise sole control over who may/may not become a licensed medical practitioner: drive as many consumers-i.e. medical professionals - and third-party participants to the examination process and offer a wide selection of content, products, and services created by those third parties to consumers. This puts the NBME in the driver's seat to generate substantial revenue(s) through examination fee(s) and subsequently the ancillary fees it derives from sitting between consumers and the products and services necessary for licensure.

4.      NBME's examination was no longer limited to a threshold examination for admission to the practice of medicine. Seemingly overnight, the utility of NBME examinations evolved from evaluation of the individual to a means of evaluation of the content and quality of the educational program. By the 1950s, the NBME realized the value of becoming the functional measuring instrument for medical schools, third party study material companies, and examination proctoring entities as a whole. This further entrenched the NBME's authority as the sole administrative body for medical professionals in the United States.

**b. NBME Expands Into the Global Market**

5.      The Educational Council for Foreign Medical Graduates, as it was then called, was incorporated in 1956 to provide information to foreign medical graduates, verify credentials, evaluate the educational qualifications of foreign trained

physicians who desired to advance their education in the United States, and arrange examinations to determine the readiness of such individuals to further their education in U.S. hospitals. Not long after it was founded, the ECFMG requested the NBME develop an examination to assess the knowledge and competence of foreign medical graduates.

6.      The NBME, by and through the ECFMG, expanded its jurisdiction from the United States to the rest of the world. The NBME provided examination materials, scoring, analysis and consultation in evaluation and measurement, while the ECFMG maintained responsibility for establishing eligibility criteria and for determining the standards for scoring and score reporting.

7.      That strategy paid off. Since 1966, the NBME, ECFMG, and the FSMB built and sustained the only method of medical education and assessment for medical professionals. From creating assessment questions, determining which topics-specialties are on the examination, and the methodology in which the exam is administered, Defendants NBME, ECFMG, and FSMB held the proverbial keys to the kingdom in the medical community. To wit, in 1966, the NBME moved its headquarters to 3900 Chestnut Street, which also housed the ECFMG and the American Board of Internal Medicine, which allowed each of these organizations "ready access" to the NBME's technical staff, professional staff, and computer system.

8.      This also attracted third-party companies to develop all types of study materials, practice examinations, and/or techniques that consumers could purchase in the hopes of attaining medical licensure. As developers and third-party companies

created more and better products, services, and results, more people purchased these materials. Today, there are any number of products, apps, content, services, and study materials that are offered by content creators, advertisers, social media companies, productivity developers, educational retailers, online merchants, and others.

9.     The exam first administered by the ECFMG in 1958 was designed with one purpose, i.e., to screen graduates of international medical schools for participation in American training programs. With increasing numbers of international medical graduates wishing to remain in practice in the United States, along with increasing numbers of US citizens educated overseas who wished to return home to practice medicine, the NBME and FSMB became concerned regarding administration of the ECFMG exam taken by international medical graduates. Exams derived from National Board Parts I and II item pools were developed for use by the Educational Council (later Commission) for Foreign Medical Graduates (ECFMG) in its certification program.

10.     By the mid-1960s, a number of state medical boards discontinued their individualized essay testing and substituted, in whole or in part, previous National Board Parts I and II multiple choice examinations. In 1967, the FSMB and the leaders of the National Board proposed using one examination to be used by all state boards; in doing so, the FSMB would provide a licensing examination to individual state board(s) to score candidates. The development of the examination would be conducted by a committee appointed by the FSMB in consultation with the National

Board. During this same time, the American College of Physicians (ACP) approached the National Board with a proposal to use multiple-choice test items in a new form of self-evaluation. The National Board accepted the ACP's proposal and eventually incorporated the multiple-choice section into the licensing examination.

11. During the 1960s, US citizens enrolled in international medical schools increasingly desired to transfer into schools in the United States. As a result, many US medical schools began the evaluation and sponsorship of applicants and generally wished to use Part I to evaluate the knowledge of these transfer students. Initially, the number of students in this category was small and the National Board's experience with them was limited. However, as more students in foreign medical schools were admitted to Part I and as more and more of those who passed Part I were unsuccessful in obtaining admission to a US medical school, the National Board became increasingly concerned. Allowing such students access to the certification examination without the accompanying requirement of study in an accredited medical school was inconsistent with the National Board's general policies. Taking and passing the certifying examination in Part I, albeit for evaluation purposes, was perceived by some as a "credential" that could be used to circumvent part of the process of National Board certification.

12. In 1969, the NBME, in cooperation with and in service to the FSMB, developed the Federation Licensing Examination (FLEX). The FLEX was derived directly from NBME examination materials. FLEX was offered to every state licensing authority with the sponsorship of the FSMB. The first administration of the

new FLEX was in June, 1985. In 1988, the FSMB and NBME jointly introduced the Special Purpose Examination (SPEX) as an objective, standardized examination of knowledge required for the general, undifferentiated practice of medicine.

13.    The NBME convened the Committee on Goals and Priorities in 1971 in order to review the process of evaluation in medical education. The committee's work, while allegedly given full freedom of expression, was done under the auspices of, and financed by, the NBME. By 1972, the NBME developed a certifying examination for a new category of health professional – assistant to the primary care physician; in 1973, the first national certification examination, created by the NBME, for physician assistants was administered.

14. In 1976, the Coordinating Council on Medical Education urged that, "All foreign medical graduates seeking opportunities for graduate medical education must demonstrate that they have met a standard of professional proficiency equivalent to that required of US medical graduates eligible for the same type or level of graduate education so that there may be assurance of their capacity not only to benefit from the educational experience but to provide effective care under supervision." Further, the Health Professions Educational Assistance Act of 1976 (Public Law 94-484) called for more stringent evaluation of foreign medical graduates seeking visas to enter the United States. The Act required the passing of Parts I and II of the National Board exams or *an equivalent* examination. The government considered the ECFMG exam unacceptable for this purpose, and

international medical graduates were not eligible for the NBME examinations at that time.

15. The NBME developed a special examination that could be considered equivalent to Parts I and II, the Visa Qualifying Examination (VQE). The VQE was discontinued in 1984 and replaced with the Foreign Medical Graduate Examination in the Medical Sciences (FMGEMS), which was superseded in 1993 when the USMLE was implemented.

16. In the 1970s, the NBME and Association of American Medical Colleges (AAMC) created the Coordinated Transfer Application System (COTRANS) for American medical students studying abroad who wished to complete their studies at an accredited U.S. medical school. By 1980, the NBME developed the Medical Sciences Knowledge Profile (MSKP) as an assessment of medical students studying overseas who wished to transfer with advanced placement to AAMC constituent schools.

17. In 1979, the NBME developed a separate examination program for evaluating students applying for advanced placement that was implemented in June 1980. The examination became an integral part of the Association of American Medical Colleges' (AAMC) Medical Sciences Knowledge Program, the program was eventually discontinued in 1989.

18. Beginning in 1981, the FSMB and NBME revised the FLEX program to increase its strength in evaluating physicians for licensure. In the development of the new FLEX, the NBME assumed responsibility for appointment of test

committees, design of the examinations, psychometric analysis and standard-setting procedures, and ownership of the test materials. The FSMB had responsibility for establishing eligibility requirements, administration of the exams, and review of the examination specifications and standards to assure their appropriateness for licensing physicians.

19. In 1984, NBME and ECFMG agreed to discontinue their separate examination programs (i.e., NBME's Visa Qualifying Exam and ECFMG's exam) for foreign medical graduates and implemented the Foreign Medical Graduate Examination in Medical Sciences (FMGEMS). In 1988, under the sponsorship of the ECFMG, FSMB and NBME, a coalition was convened to consider the concept of a single examination for medical licensure, leading to publication, in March 1989, of the Proposal for a Single Examination for Medical Licensure.

20. In 1988, the Federation of State Medical Boards (FSMB) and its FLEX Board agreed to develop an examination for assessing physicians who were years beyond initial licensure. The National Board of Medical Examiners agreed to assist the FSMB, and in 1988 the first Special Purpose Examination (SPEX) was administered. As of the NBME's centennial year, the SPEX program remains an active, joint program of FSMB and NBME.

c. **Collaboration and Creation of the USMLE**

21.    In 1988-1989, under the sponsorship of the ECFMG, FSMB and NBME, a coalition of medical organizations convened a task force to consider a single examination for medical licensure. The organizations represented on the task force

included, in addition to ECFMG, FSMB and NBME, the Accreditation Council for Graduate Medical Education, the American Medical Association, the Association of American Medical Colleges, the National Board of Osteopathic Medical Examiners, and the US Department of Health and Human Services.

22. In 1990, the Federation of State Medical Boards and the National Board of Medical Examiners took action to establish a single, uniform examination for medical licensure in the United States. Both organizations agreed that the United States Medical Licensing Examination (USMLE) would replace the two examination programs used at that time in the medical licensing process: the Federation Licensing Examination (FLEX) and the certifying examinations of the NBME (Parts I, II and III). The USMLE was conceived as a joint program of the FSMB and NBME, with governance by its Composite Committee, comprising representatives of the FSMB, NBME, the Educational Commission for Foreign Medical Graduates, and the public.

23. The decision of the FSMB and NBME to discontinue their examination programs and implement the USMLE acted as a single pathway for medical licensure in the United States. Later, ECFMG and NBME partnered to form the Clinical Skills Evaluation Collaboration to introduce a test of clinical skills into the USMLE examination sequence.

24. With the 2001 decision of the NBME and the Federation of State Medical Boards (FSMB) to implement a clinical skills examination as part of USMLE, it became clear that the NBME and FSMB would have to include the Educational

Commission for Foreign Medical Graduates (ECFMG) and implement a clinical skills examination as part of its certification program. An agreement was signed by ECFMG and NBME in 2003 which divvied up the responsibility as follows: ECFMG has responsibility for building the test centers and for managing operations at the test center, including hiring center staff and standardized patients and scheduling. The NBME has primary responsibility for test development, scoring, and quality assurance. The two organizations share equally in tasks related to technology infrastructure.

### d. Global Expansion of the NBME

25. The NBME expanded beyond the United States and began providing examination services, in 2002, to four countries (France, Panama, China and Japan). In 2003, NBME appointed a task force to review international opportunities, craft strategies, and provide future directions for NBME's international collaborations.

26. Since that time international interest in NBME's programs and services has grown substantially. Since their initial expansion in 2003, NBME has worked in various capacities with Panama, China, Ireland, United Kingdom, Italy, Kazakhstan, Taiwan, Portugal, Dubai Healthcare City, Belgium, Saudi Arabia and the Gulf Region, Singapore, Brazil, and others. NBME staff members work with regulatory agencies to create examinations for licensure and with foreign medical schools and institutions to develop residency selection examinations.

27. In the fall of 2002, the ECFMG and NBME began synthesizing existing clinical skills evaluation resources in order to develop a collaborative arrangement to provide the technical services necessary for the development and delivery of standardized patient examinations. On May 5, 2003, ECFMG president James A. Hallock, MD and NBME president Donald E. Melnick, MD, signed the collaboration agreement.

28. NBME began administering the International Foundations of Medicine (IFOM) examinations in 2007. The IFOM was comprised of two types of examinations, the IFOM Basic Science Examination and the IFOM Clinical Science Examination. The Clinical Science Examination is used for benchmarking for individuals and medical schools and for residency selection in several countries.

29. An agreement creating Clinical Skills Evaluation Collaboration (CSEC) was signed by the National Board and Federation of State Medical Boards in 2003 to implement a clinical skills examination as part of USMLE, staff members from ECFMG and NBME were merged into a virtual organization, occupying common space, and directed by the Clinical Skills Evaluation Collaboration (CSEC) Executive Director, who reports jointly to the CEOs of the two parent organizations.

30. The Step 2 Clinical Skills (CS) examination became an operational USMLE program on June 14, 2004 at the Clinical Skills Evaluation Center in Philadelphia, and over the next several months the remaining sites in Atlanta, Los Angeles, Chicago, and Houston opened as well.

31. The Step 2 Clinical Skills examination was established by the Educational Commission for Foreign Medical Graduates, with whom the NBME partners to form the Clinical Skills Evaluation Collaboration and the Federation of State Medical Boards (FSMB), NBME's partner in the USMLE.

32. In 2008, the Membership of the NBME requested the development of a series of policy statements regarding health system reform. NBME participated in identifying areas of interest and drafting policy and background language. The rationale for the policy document included supporting the goals of healthcare reform and also committing the NBME to promoting these goals, particularly NBME assessment instruments.

33.    In late September 2010, the NBME, along with the Educational Commission for Foreign Medical Graduates (ECFMG) and the Federation of State Medical Boards (FSMB), co-hosted the 9th biennial meeting of the International Association of Medical Regulatory Authorities (IAMRA). Staff members from each host organization participated in three working groups: program planning (led by ECFMG), logistics (led by NBME), and marketing (led by FSMB).

## II.    The USMLE Program Is A Platform

34. Assessment Programs such as the USMLE are used to determine the standard(s) for medical professionals seeking to gain licensure with advanced testing techniques and components. The USMLE program consists of services and features that result in a distinct product for consumers and third parties.

35. The USMLE is a platform. Platforms bring together different groups that benefit from each other's participation on the platform. A food delivery app, for example, is a multisided platform that brings together restaurants, couriers, and consumers. A two-sided platform, for example, may bring together service providers on the one hand and consumers on the other. The technology and economics of the USMLE incurs competition over study materials and pricing in ways that do not directly relate to the examination itself. Consumers care about the non-transactional components of the USMLE, such as the costs associated with the exam, the results produced, and they care about non-transactional components of study materials, such as their validity and effectiveness.

36. The economics of a USMLE platform are such that the platform's value to users – and in turn to the platform operator – increase when new study materials and parameters are added to the platform. In order to create these economic benefits for itself and for its users, NBME has opened its USMLE platform to third party assessment organizations, whose contributions and innovations have created enormous value. NBME has willingly opened the platform to third-party organizations to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties.

37. In contrast, liming the amount of attempts and restricting accessibility created by third-party study companies - and therefore available to medical students and graduates - makes the administration of the USMLE exponentially more restrictive and deprives the NBME, ECFMG, and FSMB of the economic value it would gain as

the platform operator. It makes no economic sense for the NBME to further restrict the administration of the examination(s) and sacrifice the profits it would earn from repeated attempts unless it has some other compensating reason to do so, such as protecting its monopoly profits.

## III.  NBME AND FSMB UNLAWFULLY MAINTAINS THEIR MONOPOLY POWER

### a.  NBME Harms Competition By Imposing Contractual Restriction, Fees, And Taxes On Study Materials And Distribution

38. NBME has exercised a singular control over the administration of the USMLE since the introduction of the examination. Notwithstanding the increasing success of the exam, the NBME began to fear that the disintermediation of its platform would threaten NBME's substantial profits from examination fees and related revenue streams.

39. Accordingly, NBME exercised its control of examination creation and distribution in key areas to cement the USMLE and the USMLE website as the primary gateway to practice examinations, products, and services. NBME often claims that these rules and restrictions are necessary to protect the integrity of the exam. In reality, the NBME imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its USMLE examination fees and/or for the importance of the platform itself.

40. Three aspects of NBME's efforts to protect and exploit its examination monopoly are worth noting. First, NBME exercises its control over examination creation and distribution to dictate how medical students and medical graduates

prepare for the examination(s), enforcing rules and restrictions that stop or delay examinees from preparing for the examination(s) in ways that threaten the NBME's power. In doing so, NBME influences the type of medical graduate and/or medical student that attempts the exam both before and during the administration. For example, Optima University ("Optima") was a third-party test-preparation company that advertised courses tailored to students and graduates for the USMLE Examination. Prospective examinees enrolled in Optima in anticipation of sitting for the USMLE Exam; around this same time, in 2009, NBME and FSMB announced that both entities had filed a civil lawsuit and that "individuals who attended Optima's program *or are considering doing so* risk having their USMLE scores delayed and/or classified as indeterminate. They may also be subject to other consequences, including charges of irregular behavior, as a result of their participation."[4]

41. Second, NBME drives medical students and graduates away from products and services that compete with or threaten NBME. In doing so, NBME increases the cost of sitting for the exam and friction of switching between study platforms and/or test-prep programs and generates extraordinary profits through selling practice examination(s), advertisements, and assessments.

42. The NBME, FSMB, and ECFMG have the ability to determine the fees associated within the USMLE Program and how various individuals are to be charged in order to participate in the USMLE. For example, <u>every year</u> since December, 2018,

---

[4] *Thomas v. NBME*, 2015 U.S. Dist. LEXIS 18738, 10 (E.D. Pa Feb. 13, 2015).

the ECFMG has increased the cost(s) associated with the USMLE Program and

Certification for the ECFMG. As reflected in their announcements:

a. On December 28, 2018, effective January 1, 2019, ECFMG announced

that fees for the following ECFMG applications/service requests would

increase to the following:

   i. The fee for Application for ECFMG Certification will be $135.
   ii. The examination fees for USMLE Step 1 and Step 2 Clinical
       Knowledge (CK) will be $940 for each exam registration.
   iii. The examination fee for Step 2 Clinical Skills (CS) will be $1,580
        for each exam registration.
   iv. The fee for an extension of eligibility period for USMLE Step 1
       and Step 2 CK will be $80.
   v. The fee for a change of testing region for USMLE Step 1 and Step
      2 CK will be $75.
   vi. The fee for rescheduling a Step 2 CS testing appointment will be
       0-$1,290 (depending on date of cancellation).
   vii. The fee for a Certification Verification Service (CVS) request will
        be $50.
   viii. The fee for an application for J-1 visa sponsorship will be $340.[5]

b. On December 27, 2019, Effective January 1, 2020, ECFMG announced

that fees for the following ECFMG applications/service requests would

increase to the following:

   i. The fee for Application for ECFMG Certification will be $145.
   ii. The examination fees for USMLE Step 1 and Step 2 Clinical
       Knowledge (CK) will be $965 for each exam registration.
   iii. The examination fee for Step 2 Clinical Skills (CS) will be $1,600
        for each exam registration.
   iv. The fee for an extension of eligibility period for USMLE Step 1
       and Step 2 CK will be $90.
   v. The fee for a change of testing region for USMLE Step 1 and Step
      2 CK will be $85.

---

[5] *See* ECFMG Fee Increase Announcement, December 27, 2018. **Exhibit 3**.

      vi.   The fee for rescheduling a Step 2 CS testing appointment will be 0-$1,300 (depending on the date of cancellation).

     vii.   The fee for a Certification Verification Service (CVS) request will be $55.

   viii.   The fee for an application for J-1 visa sponsorship will be $350.[6]

c.  On December 17, 2020, Effective January 1, 2021, ECFMG announced that fees for the following ECFMG applications/service requests would increase to the following:

       i.   The fee for Application for ECFMG Certification will be $150.

      ii.   The examination fees for United States Medical Licensing Examination (USMLE) Step 1 and Step 2 Clinical Knowledge (CK) will be $975 for each exam registration.

     iii.   The fee for a Certification Verification Service (CVS) request will be $60.

     iv.   The fee for an application for J-1 visa sponsorship will be $360.

      v.   The fee to establish an Electronic Portfolio of International Credentials (EPICSM) account and confirm identity will be $130.

     vi.   The fee to verify a credential through EPIC will be $100.

     vii.   The fee to request an EPIC Report will be $50.

           1.  For credentials submitted to EPIC on or after January 10, 2018, the first report requested for each credential will remain free.

           2.  For credentials submitted to EPIC prior to January 10, 2018, the first report requested for each credential will remain $15.

           3.  For a previously verified credential, reports will be $50.[7]

d.  On December 23, 2021, ECFMG announced that effective January 1, 2022, ECFMG announced that fees for the following ECFMG applications/service requests would increase to the following:

       i.   The fee for Application for ECFMG Certification will be one hundred sixty ($160.00) dollars.

---

[6] *See* ECFMG Fee Increase Announcement, December 27, 2019. **Exhibit 4.**
[7] *See* ECFMG Fee Increase Announcement, December 17, 2020. **Exhibit 5.**

    ii. The examination fees for United States Medical Licensing Examination® (USMLE®) Step 1 and Step 2 Clinical Knowledge (CK) will be nine hundred eighty-five ($985.00) dollars for each exam registration.

    iii. The fee for an extension of eligibility period for USMLE Step 1 and Step 2 CK will be $100.

    iv. The fee for a change of testing region for USMLE Step 1 and Step 2 CK will be $90.

    v. The fee for a Certification Verification Service (CVS) request will be $66.

    vi. The fee for an application for J-1 visa sponsorship will be $370.[8]

e. On December 23, 2022, ECFMG announced that effective January 1, 2023, ECFMG announced that fees for the following ECFMG applications/service requests would increase to the following:

    i. The examination fee(s) would increase to one thousand ($1,000.00) dollars for the USMLE STEP 1 Exam.

    ii. The examination fee(s) would increase to one thousand ($1,000.00) dollars for the USMLE STEP 2 CK Exam.

    iii. The USMLE STEP 1 International Test Delivery Surcharge Fee would increase to one hundred ninety five ($195.00) dollars.

    iv. The USMLE STEP 2 International Test Delivery Surcharge Fee would increase to two hundred twenty ($220.00) dollars.[9]

f. As of the date of this filing, the NBME has listed the 2024 exam fees for students and graduates of medical schools in the United States and Canada accredited by the Liaison Committee on Medical Education or American Osteopathic Association (AOA) as follows:

    i. STEP 1: six hundred seventy ($670) dollars;

    ii. STEP 2 CK: six hundred seventy ($670) dollars; and

    iii. The Eligibility period extension fee: seventy ($70) dollars.[10]

---

[8] *See* ECFMG Fee Increase Announcement, December 17, 2021. **Exhibit 6**.
[9] *See* ECFMG Fee Increase Announcement, December 23, 2022. **Exhibit 7**.
[10] *See* NBME Exam Fees, 2024. **Exhibit 8**.

g.  As of the date of this filing, the FSMB has listed the STEP 3 application
fee is nine hundred twenty-five ($925) dollars.[11]

43. Third, NBME uses these restrictions to extract exorbitant fees from third
parties in a variety of ways. Since the formation of the USMLE Program, the NBME
and FSMB have collected monies from medical students and graduates for the exam,
for study materials purchased through the NBME, FSMB, and/or ECFMG, and for
mock exams that mirror the style and feel of the USMLE program. The NBME,
FSMB, and ECFMG are all able to command these prices from companies of all sizes
as well as individual examinees who attempt to self-study. For example, it is widely
recognized amongst medical students and graduates that UWorld is the premier
choice for test preparation when studying for the USMLE. While UWorld does provide
test-preparation materials for other licensure examinations, at the bottom of the
homepage, UWorld does <u>not</u> disclaim being endorsed by the NBME and/or FSMB like
it does for other entities.[12]

44. As NBME exercised its control of the examination creation and distribution,
NBME slowed its own innovation and extracted more revenue and profit from its
existing examinees. For example, should an examinee wish to have their USMLE
examination score re-evaluated and/or "Rechecked", examinees are subject to an
additional fine by the organization that registered the examinee for the exam.
However, on the USMLE website, the likelihood of a score recheck resulting in a
change in the score is "an extremely remote possibility. To date, the score recheck

---

[11] *See* FSMB Step 3 Application Fees, 2024. **Exhibit 9.**
[12] *See* UWorld Home Page, https://www.uworld.com/. **Exhibit 10.**

process has **not** resulted in a score change."[13] (Emphasis added). In other words, despite having administered the USMLE since its current version in the 1980s, the USMLE has *never* inaccurately graded an examinee's score(s).

45. Moreover, NBME's conduct demonstrates that the NBME recognized the importance of products and services for the success of the USMLE while at the same time it restricted the development and administration of examination products and services - especially those that might make it easier for non-traditional and disabled examinees to sit for the exam.

46. Each step in NBME's course of conduct built and reinforced the moat around the USMLE monopoly. The cumulative effect of this course of conduct has been to maintain and entrench the NBME's monopoly at the expense of its examinees, medical students-graduates, test-preparation companies, and other third parties. Despite major technological changes and medical understanding over the years, NBME's power to control examination creation and distribution and extract fees from customers has remained exclusively the same, unconstrained by competitive pressures. That this conduct is impervious to competition reflects the success of NBME's efforts to create and maintain its examination monopoly, the strength of the monopoly, and the durability of NBME's power.

47. NBME's monopoly maintenance has taken many forms and continues to evolve today; however, NBME's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting several products and

---

[13] *See* USMLE Score Rechecks. **Exhibit 11**.

services. By stifling these technologies, and many others, NBME reinforces the moat around its examination monopoly, not by making its products more accessible to examinees, but by discouraging innovation that threatens the exclusivity of the NBME's examination monopoly or the disintermediation of the USMLE. NBME continues to expand and shift the scope and categories of anticompetitive conduct such that the cumulative anticompetitive effect of NBME's conduct is even more powerful than that of each exclusionary act standing alone.

## IV.   THE NBME, FSMB, AND ECFMG USE ITS MONOPOLY POWER TO CONTROL THE BEHAVIOR OF APPLICANTS IN ORDER TO INSULATE THEMSELVES FROM COMPETITION

48. The NBME and FSMB use the USMLE Program's "protocols" to dictate how medical students and medical graduates study for the STEP Examinations. Third party entities could make a better, more efficient study method for the exam, but doing so will hurt the NBME, FSMB, and ECFMG's profit margins. Defendants therefore continue to impede innovation in study methods, even though doing so sacrifices the profits that the Defendants would earn from repeated attempts because it helps build and maintain their monopoly power.

49. Third party development allows examinees to have more exposure to the examination content in order to better understand the format and methodology behind the USMLE Program. Members of the medical community know all too well that the NBME, FSMB, and ECFMG's mantra is to "protect the integrity of the exam." For example, the USMLE Program is administered solely through the Prometric Center, a third-party educational testing service across the globe. During the COVID-19 global pandemic, non-essential companies such as the Prometric

Center were shut down by local, state, and federal governments. However, unlike the National Conference of Bar Examiners, who allowed prospective bar examinees to sit for the Bar Exam remotely via ExamSoft, an assessment software that allowed for secure remote proctoring, the Prometric Center provided no such alternative. Moreover, the NBME, FSMB, and ECFMG did not offer an alternative solution to the Prometric Center being shut down until government restrictions lifted, causing medical examinees across the globe to be unfairly delayed in their examination process.[14]

50. One important method utilized by the NBME, FSMB, and ECFMG is to provide a limited set of practice forms that are purchased by examinees. By providing a limited set of practice forms, the NBME, FSMB, and ECFMG are able to restrict the number of practice tests an examinee is able to use to prepare for the exam while simultaneously 'retiring' older form(s) unilaterally.[15] For example, the NBME and ECFMG advertise the accuracy of the CBSSAs for examinees, but there are only five form versions available for purchase by a prospective examinee – Forms 31-26 – restricting the available number of *practice* attempts an examinee has.[16]

51. Moreover, NBME, FSMB, and ECFMG openly state that the USMLE Program regularly monitors and analyzes test performances to determine whether there are 'unusual' score patterns or variations. Should the USMLE Program decide that unusual activity has occurred on an exam, the USMLE Program has the ability to

---

[14] *See* ECFMG Prometric Center Announcements. **Exhibit 12**.
[15] *See* NBME Comprehensive Clinical Science Self-Assessments Announcement, July 28, 2021. **Exhibit 13**.
[16] *See* CBSSA Forms 26-31. **Exhibit 14**.

unilaterally revoke the validity of the administered USMLE examination without the examinee's right to appeal the decision or otherwise contest the decision.[17]

52. Recently, the USMLE Program announced on January 31, 2024 that examinees from Nepal had an unusual score pattern that rendered *all* examinees that participated in the USMLE Program in Nepal invalid. This decision is made without the NBME, FSMB, and/or ECFMG's disclosure of the investigative efforts, remedies available to examinees, and/or any information regarding the status of examinees' position within the residency program and/or USMLE Program.[18]

53. In addition to reserving the ability to render an examination score invalid at and/or during the administration of said USMLE Program, the NBME, FSMB, and ECFMG hold the power to *retroactively* render an examination score invalid. As demonstrated by the NBME's reaction to the Nepal incident, examinees that tested in the Nepali region found themselves having not just one examination score invalidated, but **all** of their scores invalid.[19]

54. This signals to other examinees that utilizing third-party organizations for studying and preparing for the examination will put the validity of an examinee's results in jeopardy indefinitely. Not only does the NBME, ECFMG, and FSMB have the ability to render a **past** score invalid, the NBME, ECFMG, and FSMB have the

---

[17] *See* USMLE Common Questions on Anomalous Performance, 2024. **Exhibit 15**.
[18] *See* USMLE Program Statement on Notification of Invalidated Exam Scores, January 31, 2024. **Exhibit 16**.
[19] *See* Robertson, Rachael, USMLE Scores for Nepali Docs Will Remain Invalidated, Judge Rules, MedPage Today, February 22, 2024. **Exhibit 17**.

capability to restrict examinee's accessibility to future examinations, as demonstrated by the USMLE's 2024 Bulletin:

> Anomalous performance and/or unusual testing history may impact your access to the USMLE. If your performance raises concerns about your readiness to test or your motivation to pass, the USMLE program reserves the right to restrict your future access to its examinations and/or to impose conditions on future access.[20]

As demonstrated above, the NBME, FSMB, and ECFMG maintain the ability to restrict examinees from _future_ examinations should the examinee's score be considered 'anomalous'.

55. This effect is particularly powerful for certain demographics, such as low-income examinees, people of color, and otherwise marginalized groups that cannot fully participate in the USMLE program that their counterparts can. This pressure reinforces utilizing the NBME, FSMB, and ECFMG's 'official' materials and programs, not because they are better, but because it minimizes the risk(s) of score invalidation.

56. The NBME, FSMB, and ECFMG recognize that its conduct harms consumers and makes it more difficult for examinees. For example, on June 16, 2020, the USMLE's co-sponsors—the Federation of State Medical Boards (FSMB) and NBME—announced that, despite receiving requests from examinees and student organizations to accelerate or delay the change to pass/fail score reporting for USMLE Step 1 in light of the uncertainties caused by the COVID-19 pandemic and social

---

[20] _See_ USMLE Bulletin, Anomalous Performance, 2024. **Exhibit** 18.

movements across the country, NBME and FSMB would **not** alter their January 2022

timeline.[21]

## V.    THE NBME, FSMB, AND ECFMG'S 'MOAT' AROUND THE USMLE PROGRAM MONOPOLY IS WIDE AND DEEP

57. The exclusionary and anticompetitive acts described above are part of NBME,

FSMB, and ECFMG's ongoing course of conduct to build and maintain its USMLE

Program monopoly. They are hardly exhaustive. Rather, they exemplify the

innovation NBME and FSMB has stifled and NBME, FSMB, and ECFMG's overall

strategy of using its power over accessibility in the USMLE Program, program

distribution, and selectively block threatening examinees.

58. NBME, FSMB, and ECFMG has deployed a similar playbook for a much

broader range of third-party services as well, many of which present further

complications and/or hardship in accessing the USMLE Program.

59. Ultimately, the strategies NBME and FSMB have employed to date are not the

only ones NBME and FSMB can use to achieve its anticompetitive and lucrative ends.

As medicine and our understanding of standardized exams evolves, NBME, FSMB,

and ECFMG continues to evolve and shift its anticompetitive behavior to protect its

monopoly power. For example, on February 12, 2020, the FSMB and NBME

announced that they would be changing the methodology in which Step 1 of the

USMLE would be scored as well as reducing the number of overall attempts for the

USMLE Program. The NBME and FSMB have impaired examinees by further

---

[21] *See* USMLE Timeline for Step 1 Pass/Fail Score Reporting Announcement, June 16, 2020. **Exhibit 19.**

restricting the threshold for the medical profession.[22] If an examinee risks the validity of their examination by using a third-party service, they may experience significant costs, time, and other frictions if they use non-official study material(s) and/or non-official program(s).

## VI.    ANTICOMPETITIVE EFFECTS

### a. The NBME, FSMB, and ECFMG's Conduct Harms the Competitive Process

60. As described above, the NBME, FSMB, and ECFMG protects their monopoly power in the USMLE program and performance of examinees by using its control over material distribution and examination creation to suppress or delay scores, attempts, and technologies that would allow examinees the ability to fully participate in the USMLE Program without having to rely on official NBME, FSMB, and/or ECFMG product(s) and/or services.

61. As a result, NBME, FSMB, and ECFMG faces less competition from innovative, accessible technologies not because the NBME, FSMB, and/or ECFMG makes its own products better, but because it makes other products worse. With the benefit of less competition, NBME, FSMB, and ECFMG extract extraordinary profits and regulates program(s) and/or innovations to serve its interests. This leaves all examinees worse off, with fewer choices, higher prices and fees, lower accessibility to materials, accessories, and less innovation from NBME, FSMB, ECFMG, and others. Left unchallenged, NBME and FSMB will continue to use and strengthen its program

---

[22] *See* USMLE Policy Change Announcement, February 12, 2020. **Exhibit 1.**

monopoly to dictate how third parties can create and distribute study materials in the future so that they cannot threaten NBME and FSMB's monopolies.

62. NBME, FSMB, and ECFMG's conduct has resulted in less choice for examinees.

63. Even when examinees consider these alternatives, NBME, FSMB, and ECFMG's conduct has increased the technical, behavioral, monetary, and other costs of utilizing non-official materials. This undermines competition and entrenches NBME, FSMB, and ECFMG's monopoly power.

64. NBME, FSMB, and ECFMG's conduct has delayed or suppressed the emergence of accessible technologies and methodologies that would put pressure on NBME, FSMB and ECFMG's ability to accurately measure the effectiveness of the USMLE program and extract extraordinary profits from examinees.

65. NBME, FSMB, and ECFMG's conduct has harmed examinees in other ways.

66. NBME, FSMB, and ECFMG's conduct has made its own USMLE Program worse, sacrificing profits from repeated attempts by examinees in order to preserve the long-term value of maintaining its monopoly. In a competitive market, NBME, FSMB, and ECFMG would compete aggressively to support the development of popular programs and study services for examinees, which would in turn make the official NBME, FSMB, and ECFMG materials more attractive to examinees and more valuable.[23] But NBME, FSMB, and ECFMG take steps to delay or invalidate technologies and/or methodologies that would be accessible to examinees because of

---

[23] *See* NBME Self-Assessment Page. **Exhibit 20**.

the threat they pose to the NBME, FSMB, and ECFMG's licensure program monopoly.

67. NBME and ECFMG's announcements and conduct show that NBME and ECFMG are motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets.

68. The harms to the USMLE program caused by NBME, FSMB, and ECFMG's conduct are amplified by NBME and FSMB's decision to unilaterally decide the threshold for a qualified candidate. For example, the medical profession's legal counterpart, the Bar Exam, allows examinees to take the Uniform Bar Exam an unlimited number of times. Unless and until the examinee meets the score requirement for the state, the examinee is not eligible for licensure. If the NBME and FSMB allowed examinees to take an unlimited number of attempts, examinees would be able to utilize the test program(s) and/or strategies that result in a passing score the same way the Bar Exam does. The NBME and FSMB do not allow that choice, however, because if it did, the medical profession could be opened to nontraditional professionals rather than specifically professionals that perform well on standardized, high-stakes examinations.

69. NBME, FSMB and ECFMG's monopoly over the USMLE Program gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive practices. This is because NBME, FSMB, and ECFMG's program monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most examinees buy digital and physical

products, and by which third-party organizations are allowed to sell these same products to users. If NBME, FSMB, and/or ECFMG are forced to change some of these rules, they have the power to adopt new rules, restrictions, or features that reinforce the NBME, FSMB, and ECFMG's monopoly and harm competition in other ways.

### b. NBME, FSMB, And ECFMG Have Every Incentive To Use Their Monopoly Playbook In The Future

70. NBME, FSMB, and ECFMG's conduct does not just impact the past and present but poses significant risk to the medical profession. NBME and FSMB may use their USMLE Program monopoly playbook to acquire or maintain power over next-frontier programs and technologies. For example, on February 15, 2024, the NBME announced that it had acquired MedVR Education, "an extended reality platform for health care skill development."[24] As NBME and FSMB grows in its dominance, FSMB and NBME may continue delaying or stifling the innovations of third-party companies in order to lock medical professionals into NBME, FSMB, and ECFMG products.

71. The NBME, FSMB, and ECFMG have countless products and services – Self Assessments, Learning Resources, Practice Questions, and Content Outlines. These provide future avenues for NBME, FSMB, and ECFMG to engage in anticompetitive conduct and the ability to circumvent remedies. Appropriate forward-looking remedies are necessary to ensure that the NBME, FSMB, and ECFMG cannot use these products and services to further entrench its monopoly power.

---

[24] *See* NBME Acquires MedVR Education to Enhance Assessment for Medical Professionals, February 15, 2024. **Exhibit 21.**

72. NBME, FSMB, and ECFMG's conduct extends beyond just monopoly profits and even affects the flow of speech. For example, the USMLE Program is rapidly expanding its role into the audio-podcast industry and has exercised that role to control content.[25]

73. The NBME, FSMB, and ECFMG also use its monopoly to collect user data and stifle diversity in the medical profession by, among other things, impeding the ability of international medical graduates to have access to the USMLE Program. For example, all examinees are issued a 'USMLE ID Number' in order to register for the USMLE Program and, eventually, the National Residential Match Program (NRMP). First time users are required to enter biographic information to match the NBME, FSMB, and ECFMG's existing record(s) and/or be used by staff to create new records.

    a. The AAMC assigns USMLE IDs (starting with the #5) to matriculants in Liaison Committee on Medical Education (LCME) accredited US schools and transmits the data to NBME shortly after matriculation

    b. NBME staff assign USMLE IDs (starting with the #4) upon request to applicants from Osteopathic (AOA) accredited US schools and LCME- accredited Canadian schools

    c. ECFMG assigns USMLE IDs (starting with #0 or #1) to current students or graduates from an accredited international school.

74. These acts further reinforce the NBME, FSMB, and ECFMG's power in the USMLE by coding examinees and charging differing rates-fees for examinees based on the code assigned, rather than the reality of the administration of the USMLE Program. As demonstrated above, NBME, FSMB, and ECFMG individually dictate the costs associated with participating in the USMLE Program. Should an examinee

---

[25] *See* USMLE Connection, https://soundcloud.com/user-433574324. **Exhibit 22.**

that graduated from an international medical school register for the USMLE, even if said examinee sat for the USMLE in the United States, they would be forced to pay almost twice as much as their LCME-accredited counterparts who sit alongside them.

75. Moreover, it locks in the NBME, FSMB, and ECFMG's services and excludes other alternative technologies that have the potential to disintermediate the USMLE Program.

76. Finally, the NBME, FSMB, and ECFMG's monopolization of the USMLE Program market gives it tremendous power over the lives of tens of thousands of individuals across the globe. Today, the NBME, FSMB, and ECFMG uses that power to undermine rival test-preparation companies, suppress innovative technologies, and restrict eligibility for medical licensure. Tomorrow, the NBME, FSMB, and ECFMG may use their power to force the examinees to become its next profitable product.

## VI.    PRIVACY, INTEGRITY OF THE EXAMINATION, SECURITY, AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY THE NBME, FSMB, AND ECFMG'S ANTICOMPETITIVE CONDUCT

77. There are no valid, precompetitive benefits of NBME, FSMB, and ECFMG's exclusionary conduct that would outweigh its anticompetitive effects. The NBME, FSMB, and ECFMG's moat building has not resulted in lower prices, higher quality physicians, improved innovation, or better user experience for examinees.

78. The NBME, FSMB, and ECFMG market themselves on the basis of quality and security to differentiate themselves from what competition is left in the USMLE Program market. But this does not justify the NBME, FSMB, and/or ECFMG's monopolistic and anticompetitive conduct. NBME, FSMB, and ECFMG impose

contractual restraints on examinees as well as third party organizations for study material creation and distribution, imposes hefty fees on participation in the USMLE program, and conditionally restricts the validity of the examination results on the USMLE Program platform because they have the ability to do so. There are limited, if any, competitive constraints on this conduct.

79. In fact, many alternative study programs that NBME, FSMB, and ECFMG's conduct suppresses would enhance test security and privacy. Examinees would be less inclined to engage in unfair testing practices as referred to in the USMLE's January, 2024 Announcement regarding the Nepali examinee score invalidation(s) if examinees were not restricted to four attempts. Likewise, third-party organizations could offer examinees a more curated selection of methodologies and tools that better protect test security and privacy.

80. NBME, FSMB, and ECFMG are also willing to make the medical profession less secure and less effective if that helps maintain its monopoly power. For example, medical graduates and students who otherwise are proficient in medicine and are capable of practice are barred from practice simply because they are poor test-performers. If NBME, FSMB, and ECFMG wanted to, they could allow examinees to sit for multiple attempts, or even alter the format by which the USMLE Program is administered, which would instantly improve the security and efficiency of the medical profession.

81. To wit, NBME, FSMB, and ECFMG have the sole authority to dictate what is considered a 'passing score' at any time and can alter the threshold for what is considered passing without oversight. For example,

    a. On December 9, 2021, NBME announced that based on its December 2021 meeting, the USMLE Management Committee conducted a review of the USMLE Step 1 passing standard and decided that a **two-point increase** in the passing standard - used to determine a Pass or Fail outcome - would apply to Step 1 examinees testing on or after January 26, 2022. On the (then) current three-digit score scale, the 2022 passing standard would change from 194 to 196.[26]

    b. On April 11, 2022, the NBME announced based on its April 2022 meeting, the USMLE Management Committee conducted a review of the USMLE Step 2 Clinical Knowledge (CK) passing standard and decided that a **five-point increase** in the passing standard – used to determine a Pass or Fail outcome – would apply to Step 2 CK examinees testing on or after July 1, 2022. On the (then) current three-digit score scale, the passing standard would change from 209 to 214.[27] (Emphasis added).

    c. Even as recent as December 14, 2023, the NBME announced due to its December 2023 meeting, the USMLE Management Committee,

---

[26] *See* USMLE Change to Step 1 Passing Standard Begins January 26, 2022, December 9, 2021. **Exhibit 23**.
[27] *See* USMLE Change to Step 2 CK Passing Standard Begins July 1, 2022, April 11, 2022. **Exhibit 24**.

conducted a review of the USMLE Step 3 passing standard. It was decided that a **two-point increase** in the passing standard – used to determine a Pass or Fail outcome – would apply to Step 3 examinees testing on or after January 1, 2024. On the (then) current three-digit score scale, the passing standard would change from 198 to 200.[28] (Emphasis added).

82. NBME, FSMB, and ECFMG additionally carry the sole authority to dictate what examination(s) constitute the USMLE Program and can remove and/or add exams at a whim. For example, the NBME and FSMB announced on January 26, 2021 that the Step 2 Clinical Skills Exam (also known as "Step 2 CS") was going to be discontinued from the USMLE Program.[29] Most notably, however, is the fact that prior examinees who had sat for the Step 2 CS would still have their scores reflected on their USMLE Transcripts. Despite medical professionals and examinees alike raising concerns about the discriminate effect of a discontinued exam score being permanently reflected on the USMLE Transcript, the NBME and FSMB dismissed these concerns with no mention of addressing same.

83. Similarly, NBME, FSMB, and ECFMG are willing to sacrifice examinee privacy and security in other ways so long as doing so benefits the NBME, FSMB, and ECFMG. For example, examinees who sat for the USMLE Program in Nepal and have had their scores invalidated by the NBME and FSMB – are now publicized as international medical graduates and potentially black-listed from future residency

---

[28] *See* USMLE Step 3 Examination Score Change Announcement, December 14, 2023. **Exhibit 25.**
[29] *See* USMLE Work to Relaunch USMLE STEP 2 CS Discontinued, January 26, 2021. **Exhibit 26.**

programs irrespective of whether the examinee violated the USMLE Program's policies and procedures.

84. Finally, NBME, FSMB, and ECFMG selectively enforce its rules and procedures for distribution, examination creation, and participation in the USMLE program. For instance, when it benefits NBME, FSMB, and/or ECFMG, they may or may not invalidate an examinee's score(s) without providing any insight and/or information into the reason(s) why an examinee's score is invalid, what appeal right(s) the examinee has, and the likelihood of the decision being reversed.[30]

85. Ultimately, the NBME, FSMB, and ECFMG choose to make the USMLE Program private and secure when doing so benefits them. The NBME, FSMB, and ECFMG choose alternative courses when said courses help the NBME, FSMB, and ECFMG protect its monopoly power. Their conduct underscores the pretextual nature of any claim that the NBME, FSMB, and ECFMG's conduct is justified by protecting the integrity of the exam or security.

## VII.   SPECIFIC FACTUAL BACKGROUND

86. At all times relevant to this complaint, Dr. Kitchens is an international medical school graduate who graduated from the Medical University of Lublin.

87. At all times relevant to this Complaint, Dr. Kitchens has paid to sit for the United States Medical Licensing Examination ("USMLE Step").

---

[30] *See* 2024 USMLE Bulletin – Investigation. **Exhibit 27.**

88. At all times relevant to this complaint, the NBME charges graduates of medical schools in the United States and accredited by the Liaison Committee on Medical Education (LCME), an examination fee to sit for the USMLE.

89. At all times relevant to this complaint, the ECFMG charges international graduates of medical schools a fee to apply for ECFMG Certification in addition to an examination fee to sit for the USMLE.

90. At all times relevant to this complaint, the ECFMG charges international graduates of medical schools an international test delivery surcharge if individuals test in any testing region outside the United States.

91. For each attempt at the USMLE Step Exams, Dr. Kitchens paid the ECFMG Fee despite sitting for the USMLE Program within the United States alongside LCME graduates.

92. Due to the ECFMG's repeated fee increases from 2018 to the present, Dr. Kitchens has been forced to incur thousands of dollars in fees to participate in the USMLE Program.

## IX.    PARTIES

93. Plaintiff, Dr. Markcus Kitchens Jr. (hereinafter known as "Dr. Kitchens") is a resident of Madison County, in the Commonwealth of Kentucky at all times alleged herein.

94. Defendant, National Board of Medical Examiners, is headquartered at 3750 Market Street, Philadelphia, Pennsylvania, 19104. Its Registered Agent for service is CT Corporation System, located at 1015 15th Street, NW, Suite 1000, Washington, DC, 20005.

95. Defendant, Educational Commission for Foreign Medical Graduates is headquartered at 3624 Market Street, Philadelphia, PA 19104. Its Registered Agent for service is CT Corporation System, located at 1015 15th Street, NW, Suite 1000, Washington, DC, 20005.

96. Defendant, Federation of State Medical Boards is headquartered at 400 Fuller Wiser Road, Euless, TX, 76039. Its Registered Agent for service is CT Corporation System, located at 1015 15th Street, NW, Suite 1000, Washington, DC, 20005.

## X.    JURISDICTION, VENUE, AND CHOICE OF LAW

97.    Plaintiff restates, re-alleges, and incorporates herein by reference, the proceeding paragraphs as if fully set forth herein.

98.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §13, §15 and §26, to obtain injunctive relief and damages, including treble damages, costs of the suit, and reasonable attorneys' fees, against the named Defendants for injuries sustained by Plaintiff as a result of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

99.    Plaintiff has authority to bring a private right of action to pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15, to prevent the type of injury that the anti-trust laws were intended to prevent.

100.    Each of the named Defendants' actions and course of conduct are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

101.    Each of the named Defendants' actions complained of herein have harmed, and continue to harm, competition, consumers, the general welfare of similarly situated medical professionals, and Plaintiff individually. This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. §4 and 28 U.S.C. §§1331, 28 U.S.C. §§1337(a), and 28 U.S.C. §1391.

102.    The Court has personal jurisdiction over NBME, ECFMG, and FSMB, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Apple transacts business and is found within this District.

103.    Defendant NBME is a 501(c)(3) nonprofit corporation headquartered in Philadelphia, Pennsylvania. Defendant NBME is one of the largest assessment organizations for healthcare professionals in the world, generating hundreds of millions of dollars from the sale of study material(s) and related services to administration of the USMLE.

104.    Defendant NBME engages in, and its activities substantially affect, interstate trade and commerce. NBME provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

105.    Defendant ECFMG is a 501(c)(3) nonprofit corporation headquartered in Philadelphia, Pennsylvania. Defendant ECFMG is one of the largest assessment organizations for healthcare professionals in the world, generating tens of millions of

dollars from the sale of study material(s) and related services to administration of the USMLE.

106.    Defendant ECFMG engages in, and its activities substantially affect, interstate trade and commerce. ECFMG provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

107.    Defendant FSMB is a 501(c)(6) nonprofit organization headquartered in Euless, Texas. Defendant FSMB is the sole governing body for state medical and regulatory boards for healthcare professionals in the United States, generating tens of millions of dollars from sale of study material(s) and related services to administration of the USMLE.

108.    Defendant FSMB engages in, and its activities substantially affect, interstate trade and commerce. FSMB provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States and across state lines.

### XI.    CAUSES OF ACTION

**COUNT I    Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1 (NBME)**

109.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-118 as if fully set forth herein.

110.    The administration of the United States Medical Licensing Examination (USMLE) in the United States is a relevant antitrust market, and Defendant NBME has monopoly power in that market for resident medical students and graduates.

111.    NBME has willfully monopolized the administration of the USMLE in the United States through an exclusionary course of conduct and the anti-competitive acts described herein. Each of NBME's actions individually and collectively increased, maintained, or protected its assessment monopoly.

112.    NBME's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with NBME's past conduct.

113.    While each of NBME's acts are anticompetitive in their own right, NBME's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. NBME's anticompetitive acts have had harmful effects on competition and consumers.

114.    NBME's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by NBME's anticompetitive and unlawful conduct.

## COUNT II    Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1 (ECFMG)

115.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-124 as if fully set forth herein.

116.    The administration of the United States Medical Licensing Examination (USMLE) in the United States is a relevant antitrust market, and Defendant ECFMG has monopoly power in that market for international medical students and graduates.

117.    ECFMG has willfully monopolized the administration of the USMLE in the United States and internationally through an exclusionary course of conduct and the anti-competitive acts described herein. Each of ECFMG's actions individually and collectively increased, maintained, or protected its assessment monopoly.

118.    ECFMG's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded, and the specific manner of impediment may shift in response to regulatory change consistent with ECFMG's past conduct.

119.    While each of ECFMG's acts are anticompetitive in their own right, ECFMG's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. ECFMG's anticompetitive acts have had harmful effects on competition and consumers.

120.    ECFMG's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by ECFMG's anticompetitive and unlawful conduct.

**COUNT III    Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 1 (FSMB)**

121.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-130 as if fully set forth herein.

122.    The administration of the United States Medical Licensing Examination (USMLE) in the United States is a relevant antitrust market, and Defendant FSMB has monopoly power in that market for medical residents.

123.    FSMB has willfully monopolized the administration of the USMLE in the United States through an exclusionary course of conduct and the anti-competitive acts described herein. Each of FSMB's actions individually and collectively increased, maintained, or protected its assessment monopoly.

124.    FSMB's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with FSMB's past conduct.

125.    While each of FSMB's acts are anticompetitive in their own right, FSMB's interrelated and interdependent actions have had a cumulative and self-

reinforcing effect that has harmed competition and the competitive process. FSMB's anticompetitive acts have had harmful effects on competition and consumers.

126.    FSMB's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by FSMB's anticompetitive and unlawful conduct.

**COUNT IV    Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2 (NBME)**

127.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-136 as if fully set forth herein.

128.    The administration of the United States Medical Licensing Examination (USMLE) in the United States is a relevant antitrust market, and Defendant NBME has attempted to monopolize that market.

129.    NBME has attempted to monopolize the administration of the USMLE in the United States through an exclusionary course of course of conduct and the anticompetitive acts described herein. Each of NBME's actions individually and collectively increased NBME's market power in the administration of the USMLE.

130.    NBME's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with NBME's past conduct.

131.     While each of NBME's acts are anticompetitive in their own right, NBME's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. NBME's anticompetitive acts have had harmful effects on competition and consumers.

132.     In undertaking this course of conduct, NBME has acted with specific intent to monopolize, and to destroy effective competition in, the administration of the USMLE in the United States. There is a dangerous probability that, unless restrained, NBME will succeed in monopolizing the administration of the USMLE and assessment market in the United States, in violation of Section 2 of the Sherman Act.

**COUNT V     Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2 (ECFMG)**

133.     Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-142 as if fully set forth herein.

134.     The administration of the United States Medical Licensing Examination (USMLE) and assessment tools similar to the USMLE, in the United States is a relevant antitrust market, and Defendant ECFMG has attempted to monopolize that market.

135.     NBME has attempted to monopolize the administration of the USMLE in the United States through an exclusionary course of course of conduct and the anticompetitive acts described herein. Each of ECFMG's actions individually and collectively increased ECFMG's market power in the administration of the USMLE.

136.    ECFMG's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with ECFMG's past conduct.

137.    While each of ECFMG's acts are anticompetitive in their own right, ECFMG's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. ECFMG's anticompetitive acts have had harmful effects on competition and consumers.

138.    In undertaking this course of conduct, ECFMG's has acted with specific intent to monopolize, and to destroy effective competition in, the administration of the USMLE in the United States and globally. There is a dangerous probability that, unless restrained, ECFMG will succeed in monopolizing the administration of the USMLE and assessment market in the United States and globally, in violation of Section 2 of the Sherman Act.

**COUNT VI    Violation Of Section 2 of the Sherman Act, 15 U.S.C. § 2 (FSMB)**

139.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-148 as if fully set forth herein.

140.    The administration of the United States Medical Licensing Examination (USMLE) in the United States is a relevant antitrust market, and Defendant FSMB has attempted to monopolize that market.

141.    FSMB has attempted to monopolize the administration of the USMLE in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of FSMB's actions individually and collectively increased FSMB's market power in the administration of the USMLE.

142.    FSMB's anticompetitive acts include, but are not limited to, its contractual restrictions against distribution, and administration of tests that have impeded the medical profession including but not limited to, limitation on exam attempts, restrictions on when test(s) may be taken, validity of exam results, and verifying exam result(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with FSMB's past conduct.

143.    While each of FSMB's acts are anticompetitive in their own right, FSMB's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. FSMB's anticompetitive acts have had harmful effects on competition and consumers.

144.    In undertaking this course of conduct, FSMB has acted with specific intent to monopolize, and to destroy effective competition in, the administration of

the USMLE in the United States. There is a dangerous probability that, unless restrained, FSMB will succeed in monopolizing the administration of the USMLE and assessment market in the United States, in violation of Section 2 of the Sherman Act.

**COUNT VII    Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13 (NBME)**

145.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-154 as if fully set forth herein.

146.    The United States Medical Licensing Examination is administered throughout the United States and across the world by NBME and through its partner, ECFMG.

147.    NBME has attempted to directly or indirectly discriminate in price between the fees associated with the administration of the USMLE in the United States and the anticompetitive acts described herein. Each of NBME's actions individually and collectively increased the NBME's monopoly in the administration of the USMLE.

148.    NBME's direct and/or indirect discriminate pricing include, but is not limited to, its pricing rates for the eligibility period, administration of STEP 1, administration of STEP 2, eligibility period extension, and nonrefundable fee(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded and the specific manner of impediment may shift in response to regulatory change consistent with NBME's past conduct.

149.    While each of NBME's acts are anticompetitive in their own right, NBME's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. NBME's anticompetitive acts have had harmful effects on competition and consumers.

150.    In undertaking this course of conduct, NBME has acted with specific intent to monopolize, and to destroy effective competition in, the administration of the USMLE in the United States. There is a dangerous probability that, unless restrained, NBME will succeed in monopolizing the administration of the USMLE and assessment market in the United States, in violation of Section 1 of the Sherman Act.

**COUNT VIII    Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13 (ECFMG)**

151.    Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-160 as if fully set forth herein.

152.    The United States Medical Licensing Examination is administered throughout the United States and across the world by NBME and through its partner, ECFMG.

153.    ECFMG has attempted to directly or indirectly discriminate in price between the fees associated with the administration of the USMLE in the United States and internationally and the anticompetitive acts described herein. Each of ECFMG's actions individually and collectively increased the ECFMG's monopoly in the administration of the USMLE.

154.     ECFMG's direct and/or indirect discriminate pricing include, but is not limited to, its pricing rates for the eligibility period, administration of STEP 1, administration of STEP 2, eligibility period extension, and nonrefundable fee(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded, and the specific manner of impediment may shift in response to regulatory change consistent with ECFMG's past conduct.

155.     While each of ECFMG's acts are anticompetitive in their own right, ECFMG's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. ECFMG's anticompetitive acts have had harmful effects on competition and consumers.

156.     In undertaking this course of conduct, ECFMG's has acted with specific intent to monopolize, and to destroy effective competition in, the administration of the USMLE in the United States and internationally. There is a dangerous probability that, unless restrained, ECFMG will succeed in monopolizing the administration of the USMLE and assessment market in the United States and internationally, in violation of Section 1 of the Sherman Act.

**COUNT IX     Violation Of Section 1 of the Sherman Act, 15 U.S.C. § 13 (FSMB)**

157.     Dr. Kitchens hereby incorporates the allegations set forth in paragraphs 1-166 as if fully set forth herein.

158.    The United States Medical Licensing Examination is administered throughout the United States and across the world by NBME and through its partner, FSMB.

159.    FSMB has attempted to directly or indirectly discriminate in price between the fees associated with the administration of the USMLE in the United States and internationally and the anticompetitive acts described herein. Each of FSMB's actions individually and collectively increased the FSMB's monopoly in the administration of the USMLE.

160.    FSMB's direct and/or indirect discriminate pricing include, but is not limited to, its pricing rates for the eligibility period, administration of STEP 1, administration of STEP 2, eligibility period extension, and nonrefundable fee(s). The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as standardized testing and medicine advances, both the administration of the examination impeded, and the specific manner of impediment may shift in response to regulatory change consistent with FSMB's past conduct.

161.    While each of FSMB's acts are anticompetitive in their own right, FSMB's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. FSMB's anticompetitive acts have had harmful effects on competition and consumers.

162.    In undertaking this course of conduct, FSMB's has acted with specific intent to monopolize, and to destroy effective competition in, the administration of the USMLE in the United States. There is a dangerous probability that, unless

restrained, FSMB will succeed in monopolizing the administration of the USMLE and

assessment market in the United States and internationally, in violation of Section 1

of the Sherman Act.

## XII.  REQUEST FOR RELIEF

**WHEREFORE**, Dr. Kitchens respectfully requests the following to remedy these

illegal acts:

A. Adjudge and decree that NBME has acted unlawfully to monopolize, or in the alternative, attempted to monopolize, the administration of the USMLE in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B. Adjudge and decree that ECFMG has acted unlawfully to monopolize, or in the alternative, attempted to monopolize, the administration of the USMLE in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C. Adjudge and decree that FSMB has acted unlawfully to monopolize, or in the alternative, attempted to monopolize, the administration of the USMLE in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D. Enter relief as needed to cure any anticompetitive harm;

E. Enjoin NBME from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices;

F. Enjoin ECFMG from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices;

G. Enjoin FSMB from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices;

H. Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by NBME's unlawful conduct;

I. Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by ECFMG's unlawful conduct;

J. Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by FSMB's unlawful conduct;

K. Enter any additional relief the Court finds just and proper; and

L. Equitable relief as determined at trial;

M. Injunctive relief according to proof;

N. Treble damages according to proof;

O. Plaintiff's costs herein expended; and

P. Any and all other relief to which the Plaintiff may be entitled.

Respectfully Submitted,

*/s/ Dr. Markcus Kitchens*
Dr. Markcus Kitchens
622 Hampton Way #2
Richmond, KY 40475
T: (423) 314-4096
markzwanz@gmail.com
***Pro Se Plaintiff***